IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV 21-94-BLG-SPW-TJC |
| Plaintiff, | |
| vs. | **CONSENT DECREE** |
| THE NORTHERN CHEYENNE UTILITIES COMMISSION, | |
| Defendant. | |

# Table of Contents

I.      JURISDICTION AND VENUE .................................................................. 4

II.     APPLICABILITY ...................................................................................... 5

III.    OBJECTIVE .............................................................................................. 6

IV.     DEFINITIONS........................................................................................... 6

V.      CIVIL PENALTY..................................................................................... 11

VI.     GENERAL COMPLIANCE REQUIREMENTS ..................................... 12

VII.    INJUNCTIVE RELIEF............................................................................ 15

VIII.   REPORTING REQUIREMENTS ........................................................... 27

IX.     STIPULATED PENALTIES ................................................................... 31

X.      FORCE MAJEURE ................................................................................. 34

XI.     DISPUTE RESOLUTION ....................................................................... 37

XII.    INFORMATION COLLECTION AND RETENTION ........................... 39

XIII.   EFFECT OF SETTLEMENT AND RESERVATION OF RIGHTS .............. 41

XIV.    COSTS ..................................................................................................... 43

XV.     NOTICES.................................................................................................. 43

XVI.    EFFECTIVE DATE ................................................................................. 44

XVII.   RETENTION OF JURISDICTION.......................................................... 45

XVIII.  MODIFICATION ..................................................................................... 45

XIX.    TERMINATION....................................................................................... 45

XX.     PUBLIC COMMENT.............................................................................. 46

XXI.    SIGNATORIES AND SERVICE ............................................................ 47

XXII.   INTEGRATION ....................................................................................... 49

XXIII.  FINAL JUDGMENT ............................................................................... 47

XXIV.  APPENDICES .......................................................................................... 48

ii

The Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency (the "EPA"), has filed a Complaint in this action concurrently with this Consent Decree, alleging that the Northern Cheyenne Utilities Commission ("NCUC" or "Defendant"), violated Sections 301, 309, and 402 of the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 and the Water Quality Act of 1987 ("CWA" or the "Act"), 33 U.S.C. §§ 1311, 1319, and 1342.

The Complaint alleges that: (i) NCUC discharged pollutants from the Lame Deer Wastewater Treatment Facility ("Facility") in violation of the conditions and limitations of the National Pollutant Discharge Elimination System ("NPDES") permit (hereinafter "NPDES Permit"), issued to NCUC by the EPA pursuant to Section 402 of the CWA, 33 U.S.C. § 1342; (ii) NCUC failed to comply with the terms and other requirements of its NPDES Permit, including inspection, monitoring, operation and maintenance, reporting, and disinfection requirements; (iii) NCUC failed to timely obtain and was discharging without a permit upon the expiration of its NPDES Permit on February 28, 2016, until March 1, 2018; and (iv) NCUC failed to fully comply with the requirements of an Administrative Compliance Order ("Administrative Order") issued by the EPA on July 7, 2015, pursuant to Section 309(a) of the CWA, 33 U.S.C. § 1319(a). The specific alleged violations are identified in the Complaint.

The Northern Cheyenne Tribe ("Tribe") is a federally recognized tribe governed by the Northern Cheyenne Tribal Council ("Tribal Council") consisting of a President, Vice President, and Tribal Council members that represent the Tribe's community districts.

NCUC is an entity chartered under the laws of the Tribe and is responsible for providing drinking water and wastewater treatment services to five community districts within the exterior

1

boundaries of the Northern Cheyenne Indian Reservation: Lame Deer District, Busby District, Birney District, Ashland District, and Muddy District. NCUC has adopted bylaws and rules and regulations to govern it, which have been approved by the Northern Cheyenne Tribal Council.

NCUC operates and maintains the Tribally-owned Facility, located in Lame Deer, Montana, within the exterior boundaries of the Northern Cheyenne Indian Reservation. The Facility serves approximately 3,700 residents of the Lame Deer community, Dull Knife College, Lame Deer Elementary School, Lame Deer Jail, Northern Cheyenne Tribal Health, and the Northern Cheyenne Tribal Headquarters. The Facility consists of a Collection System that conveys sewage to a Lagoon for settling, aeration, and biological treatment before discharging treated wastewater to Lame Deer Creek ("Creek").

The United States alleges the NCUC has a history of noncompliance with the CWA and its implementing regulations at the Facility. Since at least 2008, NCUC has failed to maintain compliance with the terms of the Facility's NPDES Permit. Further NCUC failed to timely renew the Facility's NPDES Permit and proceeded to operate the Facility and discharge without a permit from February 29, 2016 until March 1, 2018. Unauthorized discharges of untreated or partially treated wastewater from the Facility have adversely impacted ground surfaces and waterways and threatened human health and the environment.

Plaintiff's investigations, including inspections and analysis of submissions made by NCUC to the EPA, identified the violations alleged in the Complaint and resolved by this Consent Decree.

NCUC does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint.

2

NCUC agrees that performance of the injunctive relief and compliance reporting and record keeping set forth in the Consent Decree is in the best interest of NCUC.

The EPA has worked with the Tribe and NCUC and will continue to work with the Tribe and NCUC as appropriate, pursuant to the EPA's Indian policies and other applicable policies concerning consultation with tribal governments and civil enforcement against tribal facilities. The EPA has provided, and will continue to provide as appropriate, compliance assistance and contact information for technical and compliance assistance providers to support the NCUC in complying with applicable federal law.

The United States has reviewed financial information submitted by NCUC to determine whether NCUC is financially able to pay a civil penalty. Based upon this financial information, the United States has determined that NCUC has limited financial ability to pay a civil penalty.

A review of financial documents provided by NCUC to the United States also demonstrates a significant shortfall between the revenue generated by NCUC service rates and the expenses required to operate and maintain the Facility. Recognizing this, as the governing body of the Northern Cheyenne Tribe, the Tribal Council recently passed Resolution No. DOI-069 (2020) (the "2020 Resolution") to rescind Resolution DOI-224 (2009), which imposed a moratorium on water and sewer rate increases by NCUC. The 2020 Resolution does not affect Resolution DOI-144 (2011), which directed NCUC to lower the regular fee rate by half for water and sewer services to enrolled Tribal elders. The 2020 Resolution recognizes that current NCUC funding is inadequate, and absent immediate changes, NCUC faces revenue shortages with the potential to disrupt essential services for the Reservation community. An NCUC rates study report completed October 28, 2020, also found that current water and wastewater rates are

3

insufficient to capture the full cost of these essential services and to recover the revenue shortfall NCUC must raise rates. Until NCUC revenue needed to operate the Facility equals or exceeds expenses, it will be necessary for NCUC, with the support of the Tribe, to take further actions to increase revenue.  These actions include: NCUC setting non-residential and residential customer service rates at an amount sufficient to ensure the financial solvency of NCUC and the Facility's proper operation and maintenance; NCUC continuing efforts to apply for and receive grants that will support any necessary capital improvements and proper operation and maintenance of the Facility; and NCUC requesting additional financial support from the Tribe, including but not limited to, subsidies towards community assistance programs implemented by NCUC, such as the reduced Tribal elder rate.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW THEREFORE, before the taking of any testimony upon the pleadings, without further adjudication of any issue of fact or law, and upon consent of the parties hereto by their authorized representatives, it is hereby ADJUDGED, ORDERED, and DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and over the Parties.

2.    Venue lies in this District pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because it is the judicial district where NCUC is

4

located, where a substantial part of the events or omissions giving rise to the claims occurred, and where the alleged violations occurred. For purposes of this Consent Decree, or any action to enforce this Consent Decree, NCUC consents to the Court's jurisdiction over this Consent Decree and any such action and over NCUC and consents to venue in this judicial district.

3.      For purposes of this Consent Decree, NCUC agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 301, 309, and 402 of the CWA, 33 U.S.C. §§ 1301, 1319, and 1342.

## II.      APPLICABILITY

4.      The obligations of this Consent Decree apply to and are binding upon the United States and upon NCUC, including any successor utility managers, directors, and operators; utility commissions; utility commission boards, and any other person acting on behalf of NCUC.

5.      No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve NCUC of its obligation to ensure that the terms of the Decree are implemented. At least 30 Days prior to such transfer, NCUC shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region 8, the United States Attorney for the District of Montana, and the United States Department of Justice, in accordance with Section XV (Notices).  Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Consent Decree.

6.      NCUC shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as

5

well as to any contractor retained to perform work required under this Consent Decree.  NCUC shall also provide a copy of this Consent Decree to the Tribal Council, the director of the Tribe's Department of Environmental Protection and Natural Resources, and NCUC Board. NCUC shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

7.      In any action to enforce this Consent Decree, NCUC shall not raise as a defense, the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.   OBJECTIVE

8.      It is the objective of the Parties in entering into this Consent Decree to have NCUC achieve and maintain continuous, sustainable, and long-term compliance at the Facility with the CWA, the CWA's underlying regulations, and the Facility's NPDES Permit. All obligations under this Consent Decree shall be interpreted in a manner consistent with this goal.

9.      This Consent Decree is not and shall not be interpreted to be a permit or modification of any existing permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, or any other law.

10.      This Consent Decree and the requirements set forth herein shall supersede the CWA Administrative Order issued by the EPA to NCUC on July 7, 2015, which shall be considered closed on the Effective Date of this Consent Decree.

### IV.   DEFINITIONS

11.      Terms used in this Consent Decree that are defined by the CWA or the regulations promulgated thereunder, or by the Facility's NPDES Permit, shall have the meanings assigned to

them therein, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

        a.      "Act" or "CWA" shall mean the Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

        b.      "Administrative Order" shall mean the July 7, 2015 administrative "Findings of Violation and Order for Compliance" issued by the EPA under Section 309(a) of the CWA, 33 U.S.C. § 1319(a), in the matter of <u>Northern Cheyenne Utilities Commission, Lame Deer, Montana, Lame Deer Wastewater Treatment Facility, NPDES Permit No. MT002930,</u> EPA Docket No. CWA-08-2015-0020;

        c.      "Board" shall mean the Northern Cheyenne Utilities Commission Board of Directors comprised of five voting members, one each elected from the five community districts, and non-voting representatives from the Bureau of Indian Affairs and Indian Health Services ("IHS");

        d.      "Collection System" shall mean the Facility's wastewater collection and conveyance system (including all pipes, force mains, overflow structures, regulators, bar screens, lift stations, manholes, and components thereto) owned by the Tribe and operated by NCUC that collects and conveys wastewater to the Facility's Lagoon. The Collection System was initially constructed over 50 years ago and substantially replaced or improved within the last several years. The Collection System generally consists of approximately 6.8 miles of 8" piping, 1.1 miles of 10" main line piping, and 173 manholes;

        e.      "Complaint" shall mean the complaint filed by the United States in this action;

f.      "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto and listed in Section XXIV;

g.      "Creek" shall mean Lame Deer Creek, a perennial stream determined to be a jurisdictional water of the United States by the U.S. Army Corps of Engineers that flows through the Town of Lame Deer, Montana, north to its confluence with Rosebud Creek, a tributary of the Yellowstone River, which flows into the Missouri River;

h.      "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next working day;

i.      "Defendant" shall mean the Northern Cheyenne Utilities Commission;

j.      "Discharge" shall mean any "discharge of a pollutant" as defined in 40 C.F.R. § 122.2;

k.      "Discharge Monitoring Report" or "DMR" shall mean any discharge monitoring report that NCUC is required to submit to the EPA pursuant to the Facility's NPDES Permit;

l.      "DOJ" shall mean the United States Department of Justice and any successor departments, agencies, or instrumentalities of the United States;

m.      "Effective Date" shall mean the definition provided in Section XVI;

n.      "Effluent Limit Violation" shall mean (i) any exceedance of an Average Monthly, Average Weekly, Daily Maximum, Daily Minimum, instantaneous effluent limitation,

8

narrative limitation, or any other restriction on quantities, discharge rates, and concentrations of pollutants discharged as set forth in the Facility's NPDES Permit, as determined by sampling or other monitoring required by the Facility's NPDES Permit, or (ii) any failure to attain required effluent limitations for any parameter that is otherwise required to be measured, including pH, as set forth in the Facility's NPDES Permit, as determined by sampling or other monitoring required by the Facility's NPDES Permit;

o.    "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

p.    "Facility" shall mean the Lame Deer Wastewater Treatment Facility, collectively the Lagoon, Collection System, and all related appurtenances, equipment, and infrastructure, located in the Town of Lame Deer, Montana, within the exterior boundaries of the Northern Cheyenne Reservation. Maps of the Facility's Collection System and Lagoon are attached hereto at Appendix A and B, respectively;

q.    "Lagoon" shall mean the Facility's wastewater treatment lagoon owned by the Tribe and operated by NCUC and located in the Town of Lame Deer, Montana, within the exterior boundaries of the Northern Cheyenne Reservation, and located approximately at latitude 45.628889 N, longitude 106.673611 W. The Lagoon includes a bar screen, lift station, two "fermentation pits," three cells, referred to as Cell 1, Cell 2, and Cell 3, arranged sequentially in the treatment process, baffles and floating covers, a "Bio-Dome" treatment system, blowers for aeration, and all related appurtenances;

9

r.      "NCUC" shall mean the Northern Cheyenne Utilities Commission, the operator of the Facility, and a public utility owned by the Northern Cheyenne Tribe, and any of its successor departments or agencies;

s.      "NPDES Permit" shall mean the National Pollutant Discharge Elimination System Permit No. MT0029360 issued to NCUC by the EPA, pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, for the Facility, effective June 1, 2005 (Appendix C); renewed effective March 1, 2011 through February 28, 2016 (Appendix D); superseded by the NPDES Permit effective March 1, 2018, through December 31, 2022 (Appendix E). The term shall include any future, modified, extended, or reissued NPDES permit(s) covering the Facility. A copy of the current NPDES Permit is attached to this Consent Decree as Appendix E;

t.      "Outfall 001" shall mean the point of discharge located at approximately latitude 45.628069 N, longitude 16.675456 W, authorized by the Facility's NPDES Permit to discharge pollutants from the Facility into Lame Deer Creek;

u.      "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

v.      "Parties" shall mean the United States, Northern Cheyenne Tribe and the Northern Cheyenne Utilities Commission;

w.      "Quarterly" shall mean each calendar year quarter;

x.      "Sanitary Sewer Overflow" or "SSO" shall mean any unauthorized spill, release, or discharge of sewage prior to beginning treatment in the fermentation pits of the Lagoon. This term shall include: (i) discharge to waters of the United States from the Facility's Collection System or bar screen or lift station at the Lagoon, and (ii) any release of wastewater

10

from the Facility's Collection System to public or private property that does not reach waters of the United States;

   y. "Section" shall mean a portion of this Decree identified by a Roman numeral;

   z. "Tribe" shall mean the federally recognized Northern Cheyenne Tribe, owner of the Facility;

   aa. "Unauthorized discharge" shall mean any discharge from the Facility into the Creek except as authorized by the Facility's NPDES Permit; and

   bb. "United States" shall mean the United States of America, acting on behalf of the EPA.

   cc. "Year" shall mean 365 calendar days.

## V. CIVIL PENALTY

  12. NCUC shall pay a civil penalty to the United States in the amount of $1,500.00, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging, within 30 Days after entry of this Consent Decree.

  13. NCUC shall make the above-referenced payment by Fed Wire Electronic Funds Transfer ("EFT") to the DOJ account in accordance in accordance with the instructions provided to NCUC by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the District of Montana after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which NCUC shall use to

identify all payments required to be made in accordance with this Consent Decree. The FLU will provide payment instructions to:

> Catherine Whiteman
> Staff Accountant, NCUC
> P.O. Box 747
> Lame Deer, Montana 59043
> Phone: (406) 477-6318
> Email: staffacctncuc@outlook.com

on behalf of NCUC. NCUC may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and the EPA in accordance with Section XV (Notices).

14.     At the time of payment, NCUC shall send notice that payment has been made: (i) to the EPA via email at ciwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) to the United States via email or regular mail in accordance with Section XV (Notices). Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States v. Northern Cheyenne Utilities Commission and shall reference the civil action number, CDCS Number and DOJ Case No. 90-5-1-1-11646.

## VI.     GENERAL COMPLIANCE REQUIREMENTS

15.     NCUC shall comply with all applicable requirements of the Facility's NPDES Permit, the CWA, and its implementing regulations, alleged to have been violated with respect to the Facility.

16.     NCUC shall perform the work required by this Consent Decree in compliance with the requirements of all applicable federal, Tribal, and local laws, regulations and permits,

including, but not limited to, the Facility's NPDES Permit, the CWA, and its implementing regulations.

17.     NCUC shall achieve and maintain compliance with the terms and conditions of this Decree and the CWA at the Facility by adhering to the compliance program and schedules set forth below and in the Facility's NPDES Permit.

18.     Approval of Deliverables.  After review of any plan, report, or other item required to be submitted pursuant to this Consent Decree, EPA shall, in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remaining; or (d) disapprove the submission.

19.     If the submission is approved pursuant to Paragraph 18, NCUC shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part pursuant to Paragraph 18(b) or (c), NCUC shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to NCUC's right to dispute only the specified conditions or the disapproved portions, under Section XI (Dispute Resolution).

20.     If the submission is disapproved in whole or in part pursuant to Paragraph 18(c) or (d), NCUC shall, within 45 days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, NCUC shall proceed in accordance with the preceding Paragraph.

21.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require NCUC to correct any deficiencies, in accordance with the preceding Paragraphs, subject to NCUC's right to invoke Dispute Resolution and the right of the EPA to seek stipulated penalties as provided in the preceding Paragraphs.

22.     Any plan, report, or other item required to be submitted pursuant to this Consent Decree shall be deemed effective upon submittal and NCUC shall take all actions required by the plan, report, or other item, and accompanying schedule.

23.     Any stipulated penalties applicable to the original submission, as provided in Section IX, shall accrue during the 30 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of NCUC's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

24.     Permits. Where any compliance obligation under this Section requires NCUC to obtain a federal, Tribal or local permit or approval, NCUC shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. NCUC shall apply for renewed or new coverage under the Facility's current NPDES Permit by June 30, 2022. NCUC shall otherwise apply for renewed or new coverage under a NPDES Permit for discharges from the Facility 180 calendar days prior to the expiration of the current NPDES Permit. NCUC may seek relief under the provisions of Section X (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if NCUC has submitted

14

timely and complete applications and have taken all other actions necessary to obtain all such permits or approvals.

## VII.   INJUNCTIVE RELIEF

### NPDES Permit Compliance

25.     At all times, NCUC shall operate and discharge from the Facility in compliance with the Facility's NPDES Permit including, but not limited to, requirements pursuant to effluent limitations, ammonia compliance schedules, self-monitoring, submittal of DMRs, inspections, record-keeping, non-compliance reporting, and proper operation and maintenance.

### Facility Related Physical Improvements

26.     Lagoon Renovation.

a.     Sludge Removal. NCUC has completed the necessary sludge removal from Cell 2 of the Lagoon to allow for installation of a Bio-Dome system. NCUC shall manage the sludge levels in Cell 2 of the Lagoon in a manner that ensures proper operation and treatment capability of the Lagoon wastewater treatment system, including the Bio-Dome system. Within four years of the Effective Date, NCUC shall conduct a sludge depth study of the Facility's Lagoon fermentation pits, Cell 1, and Cell 2 to determine the depth of sludge and submit to the EPA for review and approval a proposed schedule for sludge removal or, if sludge removal is not imminently required, a proposed schedule for a future sludge depth study.

b.     Bio-Dome Installation in Cell 2. NCUC has completed the installation of 40 Bio-Domes in Cell 2 of the Lagoon, to provide year-round treatment of certain pollutants, including BOD, Total Suspended Solids, and ammonia. Funding for the installation of additional Bio-Dome units and/or other treatment equipment to further assist in meeting effluent limits

provided in the Facility's NPDES Permit is available through the IHS. NCUC shall complete the installation of the additional treatment equipment approved and funded by IHS in accordance with the Deliverables and Deadlines Schedule attached as Appendix H. Any modifications to the Deliverables and Deadlines Schedule shall be agreed upon by all parties and in writing in accordance with Section XVIII (Modifications) of the Consent Decree.

        c.      To ensure proper operation of the Bio-Dome system, blowers, trunk lines, manifolds, and individual airlines connected to each Bio-Dome have also been installed. NCUC shall operate and maintain the Bio-Dome system, including the current 40 Bio-Domes, any additional Bio-Domes installed, and any related appurtenances, in accordance with the standard operating procedures and any operating manuals and other project completion manuals provided by IHS.

        d.      <u>Cover Installation over Fermentation Pits</u>. NCUC has completed the installation of a modular floating insulation cover over the Lagoon fermentation pits to retain heat to sustain biological treatment in the winter. NCUC shall operate and maintain the floating insulation cover in a manner that allows for retention of heat and bacteriological function during the winter season.

        e.      <u>Lift Station Renovation</u>. NCUC has completed the Facility lift station renovation project, including installation of a bar screen, lining of the wet well, installation of two new pumps, and installation of new electrical and control equipment. NCUC shall operate and maintain the Facility's lift station in accordance with any lift station and control panel operating manuals and any other project completion manuals provided by IHS.

16

      f.      Equipment Replacement Parts. Within 90 Days of the Effective Date, NCUC shall acquire and maintain a replacement pump for each make, model, or type of pump suited for use at the Lagoon's lift station. Further, NCUC, in consultation with IHS, will determine any other essential equipment spare parts for the Lagoon lift station that are necessary for NCUC to maintain in its possession for the purpose of timely repairing equipment malfunctions and ensuring continued operation in the event of future equipment failures. Limited funding is available to NCUC through IHS to acquire certain equipment spare parts. Any pump or replacement part acquired and maintained by NCUC to satisfy the requirements of this Decree shall be stored in a secure location solely controlled and accessible by NCUC. Lagoon lift station replacement parts and pumps may only be used by NCUC and for the equipment they are intended to replace.

      27.     Collection System Improvements. NCUC has completed video assessment of the Collection System and repair or replacement of the areas deemed a highest priority for improvements, comprising approximately 10-20% of the Collection System. NCUC shall operate and maintain the collection system to prevent sanitary sewer overflows ("SSOs") and to ensure safe collection and transport of sewage into the Facility's Lift Station and Lagoon.

      28.     Facility Security. NCUC has completed installation of new fencing around the Lagoon. NCUC shall maintain the fencing around the Lagoon and the padlocks installed at all gates accessing the Lagoon and Lagoon lift station to prevent unauthorized persons and animals from trespassing at the Lagoon. The Parties acknowledge that the Northern Cheyenne Tribe's Roads Department shares space and access to the enclosed fencing areas where the Facility is located.

Facility Related Operational Improvements

29.     <u>Plan of Operations</u>. Within one (1) Year of the Effective Date, NCUC shall

submit to the EPA a revised "Plan of Operations" (last updated January 7, 2013) describing the

procedures, personnel, and resources to be used by NCUC to operate and maintain the Facility in

a sustainable manner consistent with applicable NPDES permits and the CWA. The Plan of

Operations, including all subparts described below, shall be reviewed by NCUC at least on an

annual basis and updated accordingly to remain current. If revised, the updated Plan of

Operations or any updated subparts must be submitted to the EPA with the next quarterly report

due under Section VIII (Reporting Requirements). The Plan of Operations, including any

changes, shall be incorporated into this Decree and implemented by NCUC upon submittal to

and approval by the EPA in accordance with Paragraphs 18-23 (Approval of Deliverables). At a

minimum, the Plan of Operations shall include the following subparts:

a.     <u>Preliminary Engineering Report</u>. An updated and current Preliminary

Engineering Report ("PER") for the Facility, including an evaluation of current dry and wet

weather capabilities of the Collection System and Lagoon, updating the last PER prepared in

2011.

b.     <u>Operations and Maintenance Manual</u>. An Operations and Maintenance

Manual detailing the procedures for operation and maintenance of the Facility consistent with the

Facility's NPDES Permit that includes, at a minimum, the following:

i.     Standard operating procedures ("SOPs") for routine operation and

maintenance of the Collection System and Lagoon. SOPs prepared for the Operations and

Maintenance Manual can contain practical and functional summaries of schedules and

18

procedures to be implemented by NCUC staff, such as checklists or bullet pointed text for each component or routine procedure listed herein, and may also consist of prepared manuals from a manufacturer or consultant.

            1.     <u>Collection System SOPs</u>. Collection System components and routine procedures for which SOPs should be developed include, but are not limited to: sewer pipes, valves, manholes, joints, and connections;

            2.     <u>Non-Routine Collection System Maintenance.</u> SOPs or other schedules and procedures should be developed for performing non-routine Collection System maintenance, such as visual inspections of manholes, filming, cleaning, clearing and repairing sewer back-ups and line breaks, and replacing lines;

            3.     <u>Lagoon SOPs</u>. Lagoon components and routine procedures for which SOPs should be developed include, but are not limited to: monitoring and recording electrical use at the lift station, blower system, and any other electrically-powered Lagoon appurtenances; monitoring and recording pump usage at the lift station (recording hours each pump is operating); maintenance of the blower system (including regular oil, filter and hose checks, and alternation of the motors to ensure longevity); conducting and recording daily visual inspections of the bar screen, lift stations, fermentation pits and cover, Bio-Domes (including an evaluation of Bio-Dome system performance based on inspections of bubble patterns, air pressure, and hose integrity), blower system, Lagoon berm integrity, and Outfall 001 (including effluent measuring flume and manhole); routine removal and disposal of debris from the bar screen as needed to protect the integrity of lift station pumps and prevent SSOs; conducting and

19

recording routine evaluation and maintenance of the Bio-Domes and air lines (such as back pressure evaluation, blow downs, and joint inspections); and conducting and recording routine inspections of all other areas of the Facility as required by the Facility's NPDES Permit.

      4.    <u>Non-Routine Lagoon Maintenance.</u> SOPs or other schedules and procedures for performing non-routine Lagoon maintenance, such as repairing berm integrity and cell liners and sludge removal and disposal;

      5.    SOPs or other schedules and procedures for NPDES Permit compliance procedures, such as monitoring, DMR submittals, non-compliance reporting, and compliance schedule report submittals.

      6.    SOPS or other procedures for determining the cause of equipment failures and identifying preventative maintenance measures for minimizing future failures;

      ii.    Records retention procedures;

      iii.    Copies of relevant forms to be used as part of the inspection and maintenance program;

      iv.    Functional description of product literature for all equipment and information management system software to be used as part of the maintenance program;

      v.    Inventory of equipment and spare parts used for daily, emergency and back-up purposes;

      vi.    Inventory procedures for maintaining, storing and replacing inventory; and

20

     vii.  Copies of current design drawings for the Lagoon, bar screen, lift station, and a map of the Collection System showing the locations of all sewer pipes, manholes, and past, present, and proposed repairs or replacements (with dates noted).

    c.  <u>Emergency Response Plan</u>. NCUC shall review and update its June 8, 2016 Emergency Response Plan for responding to and protecting the public from unauthorized discharges from the Facility, including, SSOs, back-ups, line breaks, Lagoon bypasses, upsets, and overflows. At a minimum, the following information shall be updated or added to the Emergency Response Plan:

     i.  Updated system information (population served/service connections; point of contacts for maintaining and implementing the emergency plan);

     ii.  Emergency Notification System by listing the chain of command and their contact information to be notified in the event of an emergency, as well as other persons and entities to be notified in the event of an emergency and/or in the event the Emergency Response Plan is triggered, such as NCUC staff, contractors, Tribal Council, and District Representatives, Tribal Department of Environmental Protection and Natural Resources, IHS, Northern Cheyenne Tribal Health Clinic, local Fire and Police Departments, Tribal radio and news organizations, the EPA, and State of Montana Emergency Response Services;

     iii.  A description of the actions NCUC will undertake to immediately provide public notice of, limit access to and contact with, and cease any unauthorized discharge of pollutants from the Facility to waterways and ground surfaces; including the development of Emergency Response SOPs, to minimize the volume of untreated wastewater transmitted to surface waters and clean any ground surfaces impacted by unauthorized discharges;

iv.      Identification of the personnel, equipment and resources available

to NCUC to cease, correct, and repair the condition causing or contributing to the unauthorized

discharge of pollutants to waterways and ground surfaces;

v.      A plan to ensure the preparedness (including responsiveness

training) of NCUC employees and contractors necessary for the effective implementation of the

Emergency Response Plan; and

vi.      Development of Safety SOPs for ensuring worker safety when

responding to unauthorized discharges of pollutants. The SOPs shall include description of

worker protection standards, list of confined space trainings, and an inventory of worker

protection equipment available for and to be used by NCUC in responding to unauthorized

discharges including hazardous materials suits, fans, gloves, and respirators.

d.      <u>Staffing and Management Plan</u>. NCUC shall develop a Staffing and

Management Plan describing current management and staffing positions, job descriptions and

associated qualifications, training requirements, and salaries. The Staffing and Management Plan

also shall identify any staffing increases and/or changes needed to ensure regular and emergency

Facility operations in compliance with all applicable legal requirements. If additional staff is

necessary for the NCUC to properly operate the Facility, the Staffing and Management Plan shall

include a schedule for the hiring of additional staff and the schedule shall be implemented.

30.      <u>Certified Operator</u>. Within 90 Days of the Effective Date, NCUC shall hire and

maintain at least one wastewater operator certified by a state-approved or EPA-recognized

wastewater certification program, with minimum certification level authorizing operation of

aerated, discharging lagoons, such as a Montana Level 3C certification or equivalent, to perform

22

or supervise Facility operations and maintenance. Within 90 Days of the Effective Date, NCUC shall submit documentation of wastewater operator certification to the EPA in accordance with Section XV (Notices) of the Consent Decree. If the wastewater operator's employment with NCUC or certification terminates for any reason, NCUC shall have 90 Days from the date of termination to train or hire a NCUC staff member meeting the above-outlined certification criteria. NCUC shall submit documentation of certification for any subsequently trained or hired certified operators to the EPA in accordance with Section XV (Notices) of the Consent Decree within 14 Days of training or hiring such staff.

Financial Improvements

31.     Financial Management Plan.  Within 365 Days of the Effective Date, NCUC shall develop and submit to the EPA a Financial Management Plan for NCUC. The Financial Management Plan, including all subparts described below, shall be reviewed by NCUC on at least an annual basis and updated accordingly to remain current. If revised, the updated Financial Management Plan or any updated subparts must be submitted to the EPA with the next quarterly report due under Section VIII (Reporting Requirements). The Financial Management Plan, including any changes, shall be incorporated into this Decree and implemented by NCUC upon submittal to and approval by the EPA in accordance with Paragraphs 18-23 (Approval of Deliverables). At a minimum, the Financial Management Plan shall include the following subparts

a.     Budget. Within 90 Days of the Effective Date, and annually thereafter at least 30 Days before the start of NCUC's new fiscal year, NCUC shall develop an annual budget for NCUC that includes projected revenue, salaries, overhead, capital expenditures,

23

regular operating and repair costs, emergency response costs, reserve funds, and planned repair costs for the Facility for the next three years. The budget shall also include an assessment of current funding and service rates, any revenue shortfalls, staff and equipment shortcomings, and description of what is needed for NCUC to safely and reliably provide wastewater services. The budget shall be incorporated into the Financial Management Plan in accordance with Paragraph 31 (above).

    b.  Initial Rates Study. The NCUC currently implements a bundled flat rate for water and wastewater services to residential customers, including any residential customers that qualify for the reduced Tribal elder rate. For non-residential customers, each individual non-residential customer is assigned a monthly bundled rate for water and wastewater services based on the number of fixtures. On October 28, 2020, NCUC completed an initial rates study report (hereinafter, "2020 Initial Rates Study") (attached as Appendix F), which found that current water and wastewater rates are insufficient to capture the costs of these services and must be raised. The 2020 Initial Rates Study identified four rate change scenarios with target service rates for its residential, elder and non-residential customers and also provided specific recommendations to ensure financial solvency for the NCUC to provide such services and properly operate and maintain the Facility, including options for service rate increases and the establishment of a reserve fund. In accordance with Paragraph 31.d. (below), NCUC must implement revised service rates that reflect the recommendations provided in the completed 2020 Initial Rates Study. The 2020 Initial Rates Study was submitted to EPA on November 13, 2020 and shall be  incorporated into the Financial Management Plan in accordance with Paragraph 31 (above).

24

      c.      <u>Interim Rates Study</u>. Within 2 Years of the Effective Date, NCUC shall commence an interim rates study and develop a report that evaluates NCUC's current service rates, annual budget, billing and collection policies, and the ability of NCUC to ensure financial solvency, provide wastewater services, and properly operate and maintain the Facility. The interim rates study and report may build upon the 2020 Initial Rates Study.  If the interim rates study demonstrates that the current wastewater service rates and any additional funding received, such as grant funding, is insufficient to capture the full costs of providing those services, then the interim rates study report must identify revised target service rates for wastewater service and provide specific recommendations on its current billing and collection policy, including affordability and any customer assistance programs that may need to be subsidized by the Tribe, as the owner of the Facility, to ensure financial solvency of the NCUC to provide wastewater services and properly operate and maintain the Facility. The interim rates study report shall be incorporated into the Financial Management Plan in accordance with Paragraph 31 (above).

      d.      <u>Service Rates</u>.  Within 60 Days of the Effective Date, NCUC shall develop and implement revised service rates that reflect the recommendations provided in the 2020 Initial Rates Study (Paragraph 31.b), including establishment of reserve funds. NCUC must maintain at a minimum the recommended target wastewater rates derived from the rate scheme option chosen by NCUC from the 2020 Initial Rates Study (Paragraph 31.b) until termination of this Decree pursuant to Section XIX. If the interim rates study conducted pursuant to Paragraph 31.c (above) recommends new or otherwise revised target wastewater rates, NCUC must then at a minimum implement and maintain the recommended target wastewater rates derived from the completed interim rates study (Paragraph 31.c., above) until termination of this Decree pursuant

25

to Section XIX. Current service rates must be included in NCUC's updated Billing and Collection Policy (Paragraph 31.f.)

      e.     <u>Customer Database</u>. Within 90 Days of the Effective Date, NCUC shall update and maintain its customer database to ensure that all wastewater users are accounted for, user categorization provided (e.g. residential, residential-elder, non-residential), and customer information, including name and address, are current. The updated customer database shall be incorporated into the Financial Management Plan in accordance with Paragraph 31 (above).

      f.     <u>Billing and Collection Policy</u>. Within 120 Days of the Effective Date, NCUC shall review and update its September 25, 2016 "Billing and Collection Policy" and present any updates to the Tribal Council that may require its approval. The updated Billing and Collection Policy must include current service and rates implemented in accordance with Paragraph 31.d (above) and continue to include a process that accounts for timely billing and collection, addresses delinquent balances and termination of services, and that such processes be enforced. NCUC shall also generate and evaluate monthly reports to monitor cash flow, collection levels, and rate levels. NCUC must continue to implement the updated Billing and Collection Policy and maintain the monthly reports to monitor cash flow, collection levels, and rate levels until termination of this Decree pursuant to Section XIX. The Billing and Collection Policy shall be implemented and incorporated into the Financial Management Plan in accordance with Paragraph 31 (above).

      g.     <u>Grant Applications and Awards.</u> Upon the Effective Date, NCUC shall maintain records of any grant applications and awards received (hereinafter "Grant Records") that are related to the Facility for the purpose of managing NCUC's budget associated with the

operation and maintenance of the Facility and/or capital improvements. A summary of such records, including a description of the grant application, award details and amount, and any pertinent dates concerning the specific grant, shall be included as part of the Financial Management Plan in accordance with Paragraph 31 (above), along with the relevant Grant Records.

Organizational Improvements

32.     <u>Communication and Notification Plan</u>. Within 90 Days of the Effective Date NCUC shall develop, implement, and submit to the EPA a Communication and Notification Plan intended to improve coordination and communication between NCUC and other Tribal programs and departments, such as the Tribal Department of Environmental Protection and Natural Resources, Tribal Health, Tribal Housing, Tribal Land Authority, and Tribal Roads and Transportation, with overlapping interests and impacts related to the wastewater collection and treatment services provided by NCUC. At a minimum, the Communication and Notification Plan shall be reviewed on an annual basis and updated to reflect personnel, process, and any other pertinent changes. If revised, the updated Communication and Notification Plan must be submitted to the EPA with the next quarterly report due under Section VIII (Reporting Requirements). The Communication and Notification Plan, including any changes, shall be incorporated into this Decree and implemented by NCUC upon submittal to and approval by the EPA in accordance with Paragraphs 18-23 (Approval of Deliverables).

VIII.   REPORTING REQUIREMENTS

33.     NCUC shall submit the Facility-related reports required in this Section VIII (Reporting Requirements) in addition to the monitoring, reporting and recordkeeping required by

27

the Facility's NPDES Permit and other submittals required by this Consent Decree. A summary

of the following reporting requirements and related deadlines is also included as Appendix H

(Deliverables and Deadlines Schedule).

34.   Emergency Response Reporting and Recordkeeping.  NCUC shall report any

unauthorized discharge which may endanger human health or the environment in accordance

with the Facility's NPDES permit and the Facility's Emergency Response Plan developed in

accordance with this Decree. This includes, but may not be limited to, 24-hour and 5-day follow-

up reporting.

35.   Quarterly Progress Reports. On a quarterly basis each calendar year beginning

after the first full quarter after the Effective Date, until termination of this Decree pursuant to

Section XIX, NCUC shall submit by email no later than 15 Days following the end of each

calendar year quarter a quarterly report covering the previous calendar quarter (i.e., due April 15

covering January through March, due July 15 covering April through June, due October 15

covering July through September, and due January 15 covering October through December). For

submittal purposes, a template of a quarterly progress report is provided in Appendix G. The

quarterly report shall describe the status of compliance with the Consent Decree, including, but

not limited to:

a.   The status of compliance for each project required in the Facility Related

Physical Improvements Section, Paragraphs 26 - 28 of the Consent Decree, including whether

scheduled milestones have been met and the completion date (actual or anticipated) for the

project. If a project has been completed, the date of completion need only be provided.

28

    b.  The status of compliance with each subpart of the Plan of Operations, Paragraph 29.a.-d. of the Consent Decree, including the completion date (actual or anticipated). NCUC shall also report the completion date of the most recent annual review of the Plan of Operations. If any subparts of the Plan of Operations were revised within the reporting quarter, NCUC shall also provide a copy of the relevant updated subparts with the quarterly report.

    c.  The status of compliance with Facility certified operator requirements, including whether a certified operator has been employed by NCUC for the Facility for the duration of the reporting quarter, and if not, the termination date of the certification or employment of the previous certified operator and the actual or anticipated date that a new operator will be trained or retained and certified in accordance with Paragraph 30 of the Consent Decree.

    d.  The status of compliance with each subpart of the Financial Management Plan, Paragraph 31 of the Consent Decree, including, the completion date (actual or anticipated) for each subpart and the most recent annual review of the Financial Management Plan; whether the target sewer rates or different rates for wastewater services are being implemented and collected; and a summary of fees billed and collected. If any subparts of the Financial Management Plan were revised within the reporting quarter, NCUC shall also provide a copy of the relevant updated subparts with the quarterly report.

    e.  The status of compliance with the Organizational Improvements Section, Paragraph 32 of the Consent Decree, including the completion date (actual or anticipated) of the Communication and Notification Plan.

29

      f.     A summary of any other planned or ongoing physical repairs and improvements to the Facility and their status of completion until such projects or actions are complete.

      g.     Any problems encountered or anticipated which could prevent NCUC from meeting its obligations under this Consent Decree, together with implemented or proposed solutions.

      h.     An itemized list of costs expended on Facility operation and maintenance and Consent Decree compliance.

      i.     The status of compliance with any other submittals as specifically required by the Consent Decree.

      j.     A description of any noncompliance with the requirements of this Consent Decree and the Facility's NPDES Permit and an explanation of the likely cause of the noncompliance and the remedial steps taken, or to be taken, to prevent or minimize such noncompliance in the future. If the cause of a violation cannot be fully explained at the time the quarterly report is due, NCUC shall so state in the report, investigate further the cause of the violation, and provide an update on the results of the investigation and follow-up in the next quarterly report. Nothing in this Paragraph or the following Paragraph relieves NCUC of its obligation to provide the notice required by Section X (Force Majeure).

36.     All reports required under this Section shall be submitted to the individuals and entities designated in Section XV (Notices).

37.     Each report submitted by NCUC under this Section shall be signed by a representative of NCUC and include the following certification, excepting emergency or similar notifications where compliance would be impractical:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

38.     The reporting requirements of this Consent Decree do not relieve NCUC of any reporting obligations required by the Facility's NPDES Permit, the CWA or its implementing regulations, or by any other federal, tribal, or local law, regulation, permit, or other requirement.

39.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## IX.     STIPULATED PENALTIES

40.     NCUC shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section X (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

31

41.   <u>Late Payment of Civil Penalty</u>. If NCUC fails to pay the civil penalty required to be paid under Section V (Civil Penalty) when due, NCUC shall pay a stipulated penalty of $50 per Day for each Day that the payment is late.

42.   <u>Penalty Amounts.</u> Except for Paragraph 43 (below), the following stipulated penalties shall accrue per violation per Day for each violation of a requirement in Section VI (General Compliance Requirements), Section VII (Injunctive Relief), Section VIII (Reporting Requirements), or any requirement of the Facility's NPDES Permit:

| <u>Penalty Per Violation Per Day</u> | <u>Period of Noncompliance</u> |
|---|---|
| $50 | 1st through 14th Day |
| $100 | 15th through 30th Day |
| $200 | 31st Day and beyond |

43.   The following additional stipulated penalties shall accrue per Day for failure to timely submit electronic discharge monitoring reports ("DMRs") in accordance with the Facility's NPDES Permit:

| <u>Penalty Per Violation Per Day</u> | <u>Period of Noncompliance</u> |
|---|---|
| $100 | 1st through 14th Day |
| $200 | 15th through 30th Day |
| $300 | 31st Day and beyond |

44.   Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

45.    NCUC shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

46.    The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree.

47.    Stipulated penalties shall continue to accrue as provided in Paragraph 44 during any Dispute Resolution, but need not be paid until the following:

a.    If the dispute is resolved by agreement of the Parties or by a decision of the EPA that is not appealed to the Court, NCUC shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of the EPA's decision or order.

b.    If the dispute is appealed to the Court and the United States prevails in whole or in part, NCUC shall pay all accrued penalties determined by the Court to be owing, together with interest, within 30 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.    If any Party appeals the District Court's decision, NCUC shall pay all accrued penalties determined to be owing, together with interest, within 30 Days of receiving the final appellate court decision.

48.    Upon the Effective Date, the stipulated penalty provisions of this Decree shall be retroactively enforceable as to all violations of this Decree alleged to have occurred prior to the Effective Date, provided that stipulated penalties that may have accrued prior to the Effective Date may not be collected unless and until this Consent Decree is entered by the Court.

33

49.     NCUC shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 13, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

50.     If NCUC fails to pay stipulated penalties according to the terms of this Consent Decree, NCUC shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for NCUC's failure to pay any stipulated penalties.

51.     The payment of penalties and interest, if any, shall not alter in any way NCUC's obligation to complete the performance of the requirements of this Consent Decree.

52.     Non-Exclusivity of Remedy. Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XIII (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for NCUC's violation of this Decree or applicable law, including but not limited to an action against NCUC for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## X.     FORCE MAJEURE

53.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of NCUC, of any entity controlled by NCUC, or NCUC's

contractors that delays or prevents the performance of any obligation under this Consent Decree despite NCUC's best efforts to fulfill the obligation. The requirement that NCUC exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force majeure" does not include NCUC's financial inability to perform any obligation under this Consent Decree.

54.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, NCUC shall provide notice orally or by email transmission to the EPA according to Section XV (Notices), within 72 hours of when NCUC first knew that the event might cause a delay. Within 14 Days thereafter, NCUC shall provide in writing to the EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; NCUC's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of NCUC, such event may cause or contribute to an endangerment to public health, welfare, or the environment. NCUC shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure event. Failure to comply with the above requirements shall preclude NCUC from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any

additional delay caused by such failure. NCUC shall be deemed to know of any circumstance of which NCUC, its consultant(s) or contractor(s), knew or should have known.

55.     If the EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by the EPA for such time as is necessary to complete those obligations. An extension of time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. The EPA will notify NCUC in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

56.     If the EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the EPA will notify NCUC in writing of its decision.

57.     If NCUC elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than 15 Days after receipt of the EPA's notice. In any such proceeding, NCUC shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that NCUC complied with the requirements of Paragraphs 53 and 54. If NCUC carries this burden, the delay at issue shall be deemed not to be a violation by NCUC of the affected obligation of this Consent Decree identified to the EPA and the Court.

## XI.   DISPUTE RESOLUTION

58.      Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. NCUC's failure to seek resolution of a dispute under this Section shall preclude NCUC from raising any such issue as a defense to an action by the United States to enforce any obligation of NCUC arising under this Decree.

59.      Informal Dispute Resolution.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when NCUC sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 20 Days after the conclusion of the informal negotiation period, NCUC invokes formal dispute resolution procedures as set forth below.

60.      Formal Dispute Resolution. NCUC shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting NCUC's position and any supporting documentation relied upon by NCUC.

61.      The United States shall serve its Statement of Position within 45 Days of receipt of NCUC's Statement of Position. The United States' Statement of Position shall include, but

37

need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on NCUC, unless NCUC files a motion for judicial review of the dispute in accordance with the following Paragraph.

62.     NCUC may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XV (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 10 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of NCUC's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

63.     The United States shall respond to NCUC's motion within the time allowed by the Local Rules of this Court. NCUC may file a reply memorandum, to the extent permitted by the Local Rules.

64.     Standard of Review.

        a.      Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 59 (Formal Dispute Resolution) pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by the EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable

38

principles of administrative law, NCUC shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

        b.    <u>Other Disputes</u>. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 59 (Formal Dispute Resolution), NCUC shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

    65.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of NCUC under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 47. If NCUC does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII.   INFORMATION COLLECTION AND RETENTION

    66.    The United States, and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

        a.    monitor the progress of activities required under this Consent Decree;

        b.    verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

39

    c.  obtain samples and, upon request, splits of any samples taken by NCUC or its representatives, contractors, or consultants;

    d.  obtain documentary evidence, including photographs and similar data; and

    e.  assess NCUC's compliance with this Consent Decree.

  67.  Until five years after the termination of this Consent Decree, NCUC shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to NCUC's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, NCUC shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

  68.  At the conclusion of the information-retention period provided in the preceding Paragraph, NCUC shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, NCUC shall deliver any such documents, records, or other information to the EPA. NCUC may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If NCUC asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the

name and title of each author of the document, record, or information; (d) the name and title of

each addressee and recipient; (e) a description of the subject of the document, record, or

information; and (f) the privilege asserted by NCUC. However, no documents, records, or other

information created or generated pursuant to the requirements of this Consent Decree shall be

withheld on grounds of privilege.

69.     NCUC may also assert that information required to be provided under this Section

is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any

information that NCUC seeks to protect as CBI, NCUC shall follow the procedures set forth in

40 C.F.R. Part 2.

70.     This Consent Decree in no way limits or affects any right of entry and inspection,

or any right to obtain information, held by the United States pursuant to applicable federal laws,

regulations, or permits, nor does it limit or affect any duty or obligation of NCUC to maintain

documents, records, or other information imposed by applicable federal laws, regulations, or

permits.

## XIII.  EFFECT OF SETTLEMENT AND RESERVATION OF RIGHTS

71.     This Consent Decree resolves the civil claims of the United States for the

violations alleged in the Complaint filed in this action through the date of lodging of the Consent

Decree.

72.     The United States reserves all legal and equitable remedies available to enforce

the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the

rights of the United States to obtain penalties or injunctive relief under the Act or implementing

regulations, or under other federal laws, regulations, or permit conditions. The United States

further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Facility, whether related to the violations addressed in this Consent Decree or otherwise.

73.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Facility, NCUC shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 71.

74.     This Consent Decree is not a permit, or a modification of any permit, under any federal, tribal, or local laws or regulations. NCUC are responsible for achieving and maintaining complete compliance with all applicable federal, tribal, and local laws, regulations, and permits; and NCUC's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that NCUC's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, sections 301, 309 and 402, U.S.C. §§ 1311, 1319, and 1342, or with any other provisions of federal, tribal, or local laws, regulations, or permits.

75.     This Consent Decree does not limit or affect the rights of NCUC or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of

third parties, not party to this Consent Decree, against NCUC, except as otherwise provided by law.

76.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIV.   COSTS

77.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by NCUC.

## XV.   NOTICES

78.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by mail or email, with a preference for email, addressed as follows:

As to the Department of Justice:

EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Email: eescdcopy.enrd@usdoj.gov
Reference Case DJ No. 90-5-1-1-11646

As to the Environmental Protection Agency:

Amy Swanson, Regulatory Enforcement Section Chief
Office of Regional Counsel
U.S. EPA Region 8 (8ORC-RE)
1595 Wynkoop Street
Denver, Colorado 80202-1129
Telephone: (303) 312-6906

43

Email: swanson.amy@epa.gov

Michael Boeglin, NPDES and Wetlands Enforcement Section Chief
Enforcement and Compliance Assurance Division
U.S. EPA Region 8 (8ENF-W-NW)
1595 Wynkoop Street
Denver, Colorado 80202-1129
Telephone: (303) 312-6250
Email: boeglin.michael@epa.gov

As to the Northern Cheyenne Utilities Commission:

Adam L. Spang, General Manager
Northern Cheyenne Utilities Commission
P.O. Box 747
Lame Deer, Montana 59043
Telephone: (406) 477-6318
Fax: (406) 477-6779
Email: ncuc@rangweb.net

79.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

80.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.   EFFECTIVE DATE

81.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that NCUC hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date. In the event the United States withdraws or withholds consent to this Consent Decree before entry,

44

or the Court declines to enter the Consent Decree, then the preceding requirement to perform

duties scheduled to occur before the Effective Date shall terminate.

## XVII.    RETENTION OF JURISDICTION

82.     The Court shall retain jurisdiction over this case until termination of this Consent

Decree, for the purpose of resolving disputes arising under this Decree or entering orders

modifying this Decree, pursuant to Sections XI (Dispute Resolution) and XVIII (Modification),

or effectuating or enforcing compliance with the terms of this Decree.

## XVIII.   MODIFICATION

83.     The terms of this Consent Decree, including any attached appendices, may be

modified only by a subsequent written agreement signed by all the Parties. Where the

modification constitutes a material change to this Decree, it shall be effective only upon approval

by the Court. Modifications to dates of deliverables are not considered a material change.

84.     Any disputes concerning modification of this Decree shall be resolved pursuant to

Section XI (Dispute Resolution), provided, however, that, instead of the burden of proof provided

by Paragraph 64 (Standard of Review), the Party seeking the modification bears the burden of

demonstrating that it is entitled to the requested modification in accordance with Federal Rule of

Civil Procedure 60(b).

## XIX.   TERMINATION

85.     After NCUC has completed the requirements of Section VI (General Compliance

Requirements) and Section VII (Injunctive Relief), has thereafter maintained continuous

satisfactory compliance with this Consent Decree and the Facility's NPDES permit for a period

of five years, and has paid the civil penalty and any accrued stipulated penalties required by this

Consent Decree, NCUC may serve upon the United States a Request for Termination, stating that NCUC has satisfied those requirements, together with all necessary supporting documentation.

86.     Following receipt by the United States of NCUC's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether NCUC has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

87.     If the United States does not agree that the Decree may be terminated, NCUC may invoke Dispute Resolution under Section XI. However, NCUC shall not seek Dispute Resolution of any dispute regarding termination until 30 Days after service of its Request for Termination.

## XX.   PUBLIC COMMENT

88.     The Parties acknowledge that after the lodging and before the entry of this Consent Decree, final approval by the United States is subject to the requirements of 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent to the entry of this Consent Decree if the comments received disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. NCUC consents to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified NCUC in writing that it no longer supports entry of the Consent Decree.

## XXI.   SIGNATORIES AND SERVICE

89.     Each undersigned representative of NCUC and the Acting Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

90.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. NCUC agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. NCUC need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXII.   INTEGRATION

91.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXIII.   FINAL JUDGMENT

47

92.     Upon approval and entry of this Consent Decree by the Court, this Consent

Decree shall constitute a final judgment of the Court as to the United States, the Tribe, and

NCUC.

## XXIV.   APPENDICES

93.     The following Appendices are attached to and part of this Consent Decree:

"Appendix A" is the Facility Collection System Map.

"Appendix B" is the Facility Lagoon Map.

"Appendix C" is the Facility's Former NPDES Permit (effective June 1, 2005).

"Appendix D" is the Facility's Former NPDES Permit (effective March 1, 2011).

 "Appendix E" is the Facility's Current NPDES Permit (effective March 1, 2018).

"Appendix F" is the October 28, 2020 NCUC Initial Rates Study Report.

"Appendix G" is the Quarterly Report Template.

"Appendix H" is the Deliverables and Deadlines Schedule.


SO ORDERED THIS ____8th____ DAY OF ____November____, 2021

_____

UNITED STATES DISTRICT JUDGE

48

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v.*
*the Northern Cheyenne Utilities Commission, subject to the public notice and comment*
*requirements of 28 C.F.R. § 50.7.*

Local Rule 11.1 and Local Rule 11.2 typically require traditional signatures from non-e-filers in this
jurisdiction. However, based upon discussions with Court staff, the undersigned signatories for the
United States and the U.S. Environmental Protection Agency understands that, in light of the
COVID-19 pandemic, the submission of digital signatures is currently considered acceptable by the
Court.

**FOR THE UNITED STATES OF AMERICA:**

DATED: 8 | 30 | 2021

s/ *Nathaniel Douglas*

NATHANIEL DOUGLAS
Deputy Chief
Environmental Enforcement Section
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044-7611

STACY D. COLEMAN
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street, Suite 370, South Terrace
Denver, CO 80202
Telephone: (303) 844-7240
Facsimile: (303) 844-135
Email: Stacy.Coleman@usdoj.gov

49

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. the Northern Cheyenne Utilities Commission, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.*

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

DATED: _____

KENNETH SCHEFSKI
Digitally signed by KENNETH SCHEFSKI
Date: 2021.06.15 10:49:30 -06'00'

KENNETH SCHEFSKI
Regional Counsel
Office of Regional Counsel
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO 80202

DATED: _____

DEBRA THOMAS
Digitally signed by DEBRA THOMAS
Date: 2021.06.21 16:06:57 -06'00'

DEB THOMAS
Acting Regional Administrator
Office of the Regional Administrator
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO 80202

DATED: _____

Swanson, Amy
Digitally signed by Swanson, Amy
Date: 2021.06.02 14:17:38 -06'00'

AMY SWANSON
Regulatory Enforcement Section Chief
Office of Regional Counsel
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO 80202

DATED: _____

SUZANNE BOHAN
Digitally signed by SUZANNE BOHAN
Date: 2021.06.15 11:36:24 -06'00'

SUZANNE J. BOHAN
Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO 80202

50

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. the Northern Cheyenne Utilities Commission, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.*

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

DATED: _____

Nathan Mark Pollins
Digitally signed by Nathan Mark Pollins
Date: 2021.06.24 18:58:07 -04'00'

_____
MARK POLLINS
Director, Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency

51

*THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. the Northern Cheyenne Utilities Commission, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.*

**FOR DEFENDANT NORTHERN CHEYENNE UTILITIES COMMISSION:**

DATED: _8-18-2021_    _____

|  |  |
|---|---|
| Name: | Llevando Fisher |
| Title: | NCUC Board Chair |
| Address: | PO Box 747 |
| Address: | Lame Deer, MT 59043 |
| Phone: | (406) 477-6318 |
| Email: | ncuc2021@outlook.com |

Agent Authorized to Accept Service on Behalf of Above-signed Party:

Name: _____
Title: _____
Address: _____
Phone: _____
Email: _____